PRIME PUBLISHERS, INC., Plaintiff,

v.

AMERICAN–REPUBLICAN,
INC., Defendant.

No. 300CV1333(GLG).

United States District Court,
D. Connecticut.

Aug. 7, 2001.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GOETTEL, District Judge.

On June 25, 26, and 29, 2001, this dispute between competing Connecticut newspaper publishers was tried to the Court. Plaintiff's complaint asserted five counts, including trademark cyberpiracy, dilution, and false designation of origin, as well as statutory and common law unfair competition.[1] Based on the evidence presented at trial, the Court makes the following findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT[2]

**The Plaintiff**

1. Prime Publisher, Inc. ("Prime" or "Plaintiff") is a Connecticut corporation with its principal place of business in Woodbury, Connecticut. Prime is currently the publisher of two newspapers, *Voices*, which has a Wednesday and Sunday edition, and *Town Times*, which is published once a week.

2. Prime has been publishing a newspaper under the name "Voices" for at least the last thirty years. *Voices* is a tabloid form newspaper which is distributed in the following suburban towns immediately to the west, northwest and southwest of Waterbury: Southbury, Heritage Village, South Britain, Middlebury, Naugatuck, Oxford, Seymour, Woodbury, Bethlehem, New Preston, Washington, Washington Depot, Roxbury, Bridgewater, Monroe, Sandy Hook, and Newtown, Connecticut ("the *Voices* market").

3. Prime's market does not extend over all the 169 towns in the State of Connecticut.

4. Prime's newspaper, *Voices*, is published twice a week, a Wednesday edition and a Sunday edition. The Wednesday issue is titled *"Voices"* and is distributed by mail on Wednesdays. It has a circulation of 28,000 per edition. The Sunday edition, distributed by mail on Saturday, is also titled *"Voices"* and has a circulation of 22,500 per edition. Plaintiff also publishes a Monday newspaper, *"Town Times,"* which is distributed in two towns.

5. *Voices* is a total market coverage ("TMC") product. That means that it is distributed to all occupied households in the towns in which it is distributed. *Voices* is a free newspaper, except in Sandy Hook and Newtown where it is a

---

1. Plaintiff originally alleged violations based on Defendant's use of two terms: (1) "Your Community Voice," which Defendant uses in connection with its newspapers; and (2) "voices," which Defendant uses in "ctvoices.com," one of its registered domain names. Plaintiff has since voluntarily dropped its claims concerning "Your Community Voice." Thus, we consider only its claims concerning "ctvoices.com."

2. The parties have submitted over two hundred proposed findings of facts. We have only made such findings as appeared necessary to decide the case.

paid newspaper with a circulation of about 500 copies per edition. Thus, there is no charge to most of its readers for receiving *Voices* through the mail. While there is a charge for those who order the newspaper by subscription (mostly people who live outside the *Voices* market), a relatively small number of copies are distributed by subscription.

6. Prime has no plans to publish additional newspapers, or to convert *Voices* to a newspaper which must be purchased by its readers.

7. In order for *Voices* to be distributed through the mails on the day that it is published, the U.S. Postal Service requires that Prime provide proof that over half of the households which receive *Voices* desire to continue to receive it.

8. *Voices* is a local newspaper covering activities in the communities it serves. It contains original news articles written by reporters employed by Prime. The quantity and quality of the news reporting in *Voices* of local news events is important to readers' perception of *Voices,* their interest in reading it and, therefore, the attractiveness of *Voices* to advertisers.

9. Virtually all of the revenue generated by *Voices* is as a result of advertisers paying to place advertisements in the newspaper. While most of the advertising is placed by local businesses, advertising is also placed in *Voices* (either in the form of ads in the newspaper itself or preprinted circulars distributed with the newspaper) by regional and national advertisers with stores in or adjacent to the *Voices* market.

10. Prime has more reporters covering news in the *Voices* market than any other newspaper, including the principal daily newspaper circulated in the *Voices* market, the *Waterbury Republican–American.*

### The Defendant

11. American–Republican, Inc. ("Defendant") is a Connecticut corporation with its principal place of business in Waterbury, Connecticut. It is the publisher of the *Waterbury Republican–American,* a daily newspaper which has been published in the Waterbury area for over 100 years. It contains local, state, national, and international news.

12. Defendant considers the market of the *Waterbury Republican–American* to be northwestern and western Connecticut. All the towns in the *Voices* market, except Monroe, are located in the *Waterbury Republican–American's* area of distribution. The *Waterbury Republican–American* is a daily newspaper with a circulation of approximately 58,000 copies daily. Subscribers must pay to receive the *Waterbury Republican–American.* The price is $ .50 at newsstands except on Sunday when it is more. It is principally distributed by delivery to homes and businesses by newspaper carriers and not through the mails, and is a paid subscription newspaper. It is not a TMC product since it is not received in all households in the cities and towns which it serves.

13. The *Waterbury Republican–American* is a competitor of *Voices* for advertisers. Both newspapers solicit advertising from businesses which are located in or serve the towns in the *Voices* market.

14. Defendant does have a TMC product by the name of *Country Life. Country Life* is printed in a tabloid format as is *Voices. Country Life* is distributed as part of the Thursday edition of the *Waterbury Republican–American.* In addition, to make it a TMC product, *Country Life* is also mailed free of charge to non-subscribing households in many of the towns making up the *Voices* market. Thus, *Country Life* resembles *Voices* in that they are both tabloids, they both contain local news con-

cerning the towns in the *Voices* market, they both contain advertising from businesses located in or serving the towns in the *Voices* market, and they both go to households in the *Voices* market—*Country Life* once a week on Thursday and *Voices* twice a week on Wednesday and Sunday.

**The Bee and Country Life**

15. In 1992, a weekly TMC newspaper in tabloid form called *The Weekly Star* was owned by a third party, Bee Publishing, Inc. ("Bee"). Bee offered to sell *The Weekly Star* to Prime.

16. Within weeks of Prime completing the purchase of *The Weekly Star*, the Defendant for the first time began publishing *Country Life* to be distributed in tabloid form. Bee had offered *The Weekly Star* for sale to Defendant prior to offering it for sale to Prime.

17. Defendant had decided not to purchase *The Weekly Star* but at the same time decided that it would create its own TMC product in tabloid form to distribute in the *Voices* market.

18. Thus, since late 1992, in addition to *Voices* being a competitor of Defendant's daily newspaper, the *Waterbury Republican–American*, *Voices* was a direct competitor of Defendant's weekly TMC tabloid form newspaper, *Country Life*, principally distributed in the exact same geographic areas as *Voices*.

19. *Voices* and Defendant's *Country Life* occasionally cover the same news events and have reporters writing about the same local stories. Prime and Defendant often solicit the same advertisers, both local, regional and national, for placement of advertising in *Voices* and *Country Life*, respectively. Further, in or about November, 1999, Defendant acquired the *Naugatuck Daily News* which competes for advertisers with *Voices* Sunday edition in the western part of Naugatuck. In addition, Defendant in the summer of 2000, acquired the *Heritage Villager*, a bimonthly newspaper which competes with *Voices* in Heritage Village.

**Prior Litigation**

20. In 1996, Defendant brought a copyright infringement action in the United States District Court for the District of Connecticut against Prime. *See American–Republican, Inc. v. Prime Publishers, Inc.*, No. 3:96CV1687 (DJS) (D.Conn. filed Aug. 27, 1996). In that action, Defendant claimed that a small news story in the middle pages of *Voices* was copied from a news story in the *Waterbury Republican–American*. Both stories were factual recitations of the same event. Eventually, the Court granted summary judgment in favor of Prime. The Memorandum of Decision granting summary judgment in favor of Prime in the copyright action was issued on March 26, 1999, with judgment being entered on March 30, 1999, some three or four months before Defendant registered the domain name "ctvoices.com" which is the principal subject of this litigation.

**Plaintiff's Mark**

21. The trademark "Voices" is well known in the *Voices* market. It appears in large print on the title banner of the semi-weekly editions of *Voices*.

22. On the masthead of the Wednesday edition of *Voices*, to the right of the name "Voices," there appears in black typeface a list of the names of the following towns where that newspaper is circulated. See masthead reproduced below (reduced in size).

*Voices*

The Newspaper
of Southbury, Heritage Village,
South Britain, Middlebury, Oxford, Seymour, Woodbury,
Bethlehem, New Preston, Washington, Washington Depot,
Roxbury, Bridgewater, Monroe, Sandy Hook and Newtown, CT

S & W

Vol. 33, No. 23
Copyright © 2001
One Dollar
Telephone (203) 283-2116    WWW.VOICESNEWS.COM    Periodical Postage Paid 06701-9998
USPS 845890 ISSN 0192-1471    June 6, 2001

23. The masthead of the weekend edition of *Voices* features the word "Voices" in italic text. Below the word "Voices" in much smaller print in black capital letters are the words "THE WEEKEND NEWSPAPER." The title *"THE WEEKLY STAR"* is included in small print on the title banner because it is the name of the weekly publication Prime purchased in October of 1992 and transformed into its Sunday publication. The masthead of the weekend edition of *Voices* features at its center a depiction of a large semi-circle with the word "SUNDAY" superimposed in bold capital letters three quarters of an inch high. See masthead reproduced below (reduced in size).

*Voices*

RURAL ROUTE PATRON

SUNDAY

THE WEEKEND NEWSPAPER

The Weekly
STAR

Vol. 10, No. 22
Copyright © 2001
One Dollar
Telephone (203) 203-2116    WWW.VOICESNEWS.COM    Periodical Postage Paid 06701-9998
USPS 845890 ISSN 0193-1474    June 3, 2001

24. Residents of the towns contained in the *Voices* market identify the name "Voices" with Prime's semi-weekly newspaper.

25. Prime has made efforts to develop the goodwill associated with the mark "Voices" in the *Voices* market over a thirty year period. Every time the *Voices* newspaper with its extensive local news coverage is mailed to every home in the *Voices* market, the value of the "Voices" mark is enhanced and reinforced. Further, for a number of years, Prime has published Town Guides for a number of the towns in the *Voices* market, including Southbury, Seymour, Middlebury, Oxford, Washington and Woodbury. These Towns Guides have the "Voices" mark on the front cover and contain a letter from the First Selectman of the town at issue generally thanking *Voices* for preparing the Town Guide as an important reference for both residents and prospective residents of the town at issue.

26. When other daily newspapers write news articles referring to Prime's publications, they usually refer to Prime's publication distributed in the *Voices* market as "Voices."

27. In the current edition of SNET's Waterbury area telephone directory, Prime has not identified its publication as *Voices* alone. Rather, Prime's publication is identified at page 250 as "VOICES THE NEWSPAPER" in bold block capital letters.

28. Prime's business sign, located at its principal place of business for over 22 years, has the word "VOICES" in large letters and below it in much smaller letters the words "the Newspaper."

29. Prime has not commissioned any consumer studies to test the name recogni-

tion and consumer association linking the Prime mark "Voices" to Prime.

30. Prime has not conducted any interviews or focus groups to test the name recognition and consumer association linking the Prime mark "Voices" to Prime.

31. Prime has not licensed the word "Voices" to any third party. No third party has acknowledged in any contract or consent judgment that Prime has rights in the mark "Voices."

32. Prime does not usually advertise outside its newspapers and the Town Guides, but does sometimes act as a sponsor by taking an ad, usually an eighth or a quarter of a page in program booklets, such as Bethlehem Fair Guide or the Woodbury Lions club program book. Such block program ads cost typically fifty to one hundred dollars.

33. When Prime solicits advertising for its semi-weekly TMC tabloid newspaper distributed in the *Voices* market, Prime's advertising sales representatives and by businesses placing advertisements refer to that publication by the single word "Voices ." Although Prime does not use the letters "ct" in conjunction with the mark "Voices" on the banner or title of any of its publications, national advertisers placing ads in *Voices* sometimes refer to that publication as "Voices of Connecticut" or, occasionally, "CTVoices."

34. The residents of the towns in the *Voices* market and advertisers in those towns know of Prime's semi-weekly newspaper distributed in the *Voices* market by the trademark "Voices."

### Websites

35. In recent years, both Prime and Defendant have created websites associated with their newspapers on the World Wide Web portion of the internet. In July of 1999, Defendant registered the website domain name "ctvoices.com." At the time that Defendant registered the domain, Defendant knew that plaintiff was using the mark "Voices" as the name of its semi-weekly newspaper. In late 1999 or early 2000, Prime sought to register a domain name for a website with the domain name "voices." Prime then learned that Defendant had registered the domain name "ctvoices.com." Since that name was taken, at or about that time, Prime registered the domain name "voicesnews.com." Prime also registered "towntimesnews.com." Those two domain names are the only ones Prime has registered.

36. Prime could not register the internet domain name "voices.com" as it was previously registered by a third party.

37. Use of a internet website by newspapers is a growing practice which many newspapers have already undertaken as a logical extension of a newspaper's ability to communicate with its readers and advertisers.

38. On Prime's website "voicesnews.com," the entire text of *Voices*, except for pictures and advertising, can be found online. In addition, it is possible for readers to send to Prime comments and/or opinions about matters covered in the newspaper or of interest to people in the *Voices* market. By use of the website, other website users can see and comment upon these comments/opinions.

39. Defendant has a website with the domain name "rep-am.com." Some of the news stories from the *Waterbury Republican–American* are contained on that website on a daily basis.

40. Access to a website on the internet is worldwide. A number of search engines are available to help users navigate the World Wide Web.

41. An internet search for newspapers using the name "Voices" which can be accessed over the World Wide Web reveals

at least two newspapers other than Prime's *Voices*.

42. Each of those newspapers, by virtue of its availability on the World Wide Web, can be accessed by on-line consumers throughout, and outside, the State of Connecticut.

43. In addition to "rep-am.com" and "ctvoices.com," the Defendant also owns registrations for the following domain names: mycthcme.com; ctcusine.com; ctcuisine.com; workinct.com; ctonsale.com; cthomex.com; cttowns.com; ctfun.com; ctwow.com; ctcars .com; ctautox.com; waterburyrepublican.com; republican-american.com; repam.com; repamsucks.com; waterburydemocrat.com; fromthetower.com; cyberbury.com; cyberbury.net; getacarfast.com; heritagevillager.com; gwrealtors.com.

44. Prior to registering the domain name "ctvoices.com," Defendant had never used the mark or name "Voices" to describe any product or service distributed by the Defendant in any location.

45. Defendant describes the website "ctvoices.com" as a moderated discussion board where users can express their opinions on the website and other users can comment on such opinions and express their own opinions. Defendant refers to this use as a bulletin board service where people can communicate on line with others. The website is designed to give on-line consumers the opportunity to make observations which may then be reacted to by others.

46. Although Defendant registered the domain name "ctvoices.com" in July of 1999, the website did not first operate until early 2000. Defendant expended a minimal amount of money to date in the creation and operation of the website. The registration of a domain name costs approximately $35 per year. The software used to operate the website was downloaded by Defendant off the internet from publicly available sites that did not charge for the use of the software. Any additional programming that was necessary to create the website was done in-house by *Waterbury Republican–American* staff and required a minimal amount of time (50–100 hours) and effort.

47. Defendant has made little effort to promote the "ctvoices.com" website or its domain name to date. The website has generated little use. Virtually no new material has been placed on the website by its creator, Defendant, or any users, for over a year. Defendant admits that the website in its current format has not been a success and that when Defendant decides to use the website in the future, the website would have to be entirely redone.

48. "Ctvoices.com" is listed by some search engines, but there is no current promotion of the website "ctvoices.com" other than on the *Waterbury Republican–American*'s website, "rep-am.com."

49. The website "ctvoices.com" does not currently carry the text of any of the newspapers published by the Defendant, nor does it carry classified or other advertisements, although Defendant could decide to add advertisements to the website in the future.

50. The website "voicesnews.com" carries information about many topics which also appear in the paper edition of *Voices*.

51. Information provided by "voicesnews.com" which is not currently provided by "ctvoices.com" includes current event news stories, letters, community news, national headlines, police and court news, obituaries, entertainment news, business news, sports news, young peoples' news, seniors' news, health and fitness news, bridal news, antique and art gallery news, travel news, food and cooking news, gar-

den news, pet news, weather news, national news, classifieds, business directories, information about newspapers, sports wires, fun and games, consumer guides.

52. At the *Waterbury Republican–American* website, www.rep-am.com, a hyperlink to the "ctvoicescom" website is located on the same screen or page as the name or mark "Waterbury Republican–American."

53. The top of the "ctvoices.com" website homepage, in large and prominent text, reads "CT VOICES from your own backyard."

54. Prime and Kurt Mazurosky, Prime's operations director, first learned of the existence of "ctvoices.com" in December of 1999 or January of 2000, when looking to register a domain name for Prime.

55. Kurt Mazurosky immediately brought this information to the attention of Prime's publisher, Rudolph Mazurosky, but no lawsuit was instituted until least six months later.

56. An on-line search using a search engine to find websites containing the word "voice" or "voices" reveals numerous sites. At least two other newspapers using the name "Voices" as part of their titles can be accessed over the internet.

57. Although Defendant claims that its website with the domain name "ctvoices.com" is only a bulletin board service, until last month the invisible code on the website used to index the website, called a "metatag," described "ctvoices.com" as a source for news, current events, and community interaction. After this was pointed out to Defendant in preparation for depositions last month, the metatag was changed.

58. A business advertiser located in the *Voices* market could be confused as to the origin of efforts to solicit advertising on behalf of "ctvoices.com." Such advertisers, unless sophisticated or cautious, could believe that a solicitation for advertising for "ctvoices.com" for newspaper-related use in the *Voices* market was affiliated with Prime and its semi-weekly newspaper, *Voices.*

59. There is no evidence that any online consumer searching for plaintiff's "voicesnews.com" website and using a search engine for assistance has been drawn instead to Defendant's "ctvoices.com" site.

60. If the "ctvoices.com" website were to function badly or provoke consumer dissatisfaction in any way, it could cause harm to Prime and its trademark "Voices" in the *Voices* market.

61. Defendant has used "ct" as part of the secondary level domain names it has previously registered, *see* Finding of Fact # 43, but it could give no credible reason why it chose the term "voices" for the remainder of its domain name despite its knowledge of Plaintiff's use of the mark.

62. The Terms of Service and Rules connected to the "ctvoices.com" website refer to Defendant's original and primary website address "rep-am.com." At the present time, there is a hyperlink which permits internet users to go directly from Defendant's *Waterbury Republican–American* website, "rep-am.com," to "ctvoices.com." While there currently is not a hyperlink which permits users to go directly from "ctvoices.com" to the any of Defendant's other websites, such a hyperlink or direct connection is technically possible and could be implemented at any time by Defendant.

63. Because Defendant has not yet promoted or marketed its website "ctvoices.com," there has yet been no opportunity to determine whether there will be actual confusion between the domain name "ctvoices.com" and Prime's use of

the mark "Voices" as the name of its newspaper distributed in the *Voices* market.

64. Prime has no objection to the continued existence of marks which are similar to its own if those marks are not being used by a newspaper which is a competitor.

65. Defendant would suffer little harm from being required to change the domain name of its websites to a name that does not use the mark "Voices."

### Trademark Registration

66. Prime did not seek to register the trademark "Voices" prior to Defendant's registering the domain name "ctvoices.com" because Prime believed it had registered the mark or did not believe that a competitor would use Prime's mark "Voices" in the *Voices* market for any product related to newspapers or news distribution. After learning that Defendant has registered the domain name "ctvoices.com," Prime filed an application to register the trademark "Voices" with the United States Patent and Trademark Office ("PTO") two days before commencing this action. On May 15, 2001, the PTO issued a notice indicating that the mark "Voices" was registerable. Defendant is considering whether to oppose the registration. Other newspapers have registered marks containing the word "voices" in conjunction with other words, but not standing alone.

57. Prime is in possession of no acknowledgments by any third parties of its ownership right in the term "Voices" or consent judgments or contracts whereby any third party has agreed not to use the name "Voices" or to infringe upon Prime's alleged rights therein.

68. Prior to filing the instant action against Defendant, Prime was aware of the use of the word "voice" or "voices" in other newspaper masthead titles, including the *Voice* in Winsted, Connecticut, and the *West Haven Voice,* and was aware of the use of the word "Voices" in other domain registrations. Neither of the two Connecticut newspapers have been confused with Plaintiff's papers.

69. There are about 800 registrations of words or phrases including "voice" or "voices" in the PTO.

70. Of the hundreds of newspapers in New England, four contain the term "voice" in their titles, but none contain the word "voices."

71. The *Village Voice,* a New York newspaper, may have a limited subscription in the *Voices* market, and Prime has been asked whether its newspapers are related to the *Village Voice.*

72. Prime has not registered "Voices the Newspaper" or "Voices SUNDAY *The Weekly STAR" as trademarks with the PTO.

## CONCLUSIONS OF LAW

### I CYBERSQUATTING CLAIM

Plaintiff first claims that Defendant's registration and use of the domain name "ctvoices.com" violates the Anticybersquatting Consumer Protection Act ("ACPA" or "the Act"), 15 U.S.C. § 1125(d), because it is confusingly similar to Plaintiff's mark "Voices" and because Defendant had a bad faith intent to profit from the mark. Defendant maintains that the term "voices" is descriptive as applied to newspapers and therefore not entitled to the protections of the Act. In the alternative, Defendant argues that the use of the word "voices" in its domain name is protected under the fair use doctrine. Defendant further argues that Plaintiff never uses the word "voices" standing alone; rather, Plaintiff always uses the term with "modifiers" to produce phrases such as "*Voices* —The

Newspaper" and *"Voices* SUNDAY * The Weekly STAR." Thus, Defendant argues, Plaintiff's protected mark, if it exists at all, must be comprised of more than the term "voices" standing alone.

## A. Mark's Validity

The ACPA was enacted on Nov. 29, 1999 and applies to all domain names registered before, on, or after the date of enactment. Thus, it applies to the Defendant's July, 1999 registration of "ctvoices.com"

█ In order to invoke the protections of the Act, a plaintiff must first show, as in a simple infringement action, that it has a valid trademark entitled to protection. *See, e.g., Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir. 1997) (quoting *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir. 1995)). A trademark is defined in the Act as "any word, name, symbol, or device, or any combination thereof ... used by a person ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.

█ We find that the Plaintiff's use of the word "Voices," standing alone, as a mark to identify and distinguish its newspapers from those of its competitors and to indicate the Plaintiff as the source of those newspapers establishes the word as a valid mark entitled to the protections of the Act. We do not believe that Plaintiff's use of descriptive modifiers or other terms in addition to "Voices" in its newspapers' mastheads, on its business sign, or in other uses, necessitates a finding that those other terms must be considered a part of Plaintiff's mark. We note that the Plaintiff always uses the plural "Voices"; thus, the protected mark is "Voices," not the singular "Voice."

█ The ACPA protects marks that are either famous or distinctive. 15 U.S.C. § 1125(d)(1)(A)(ii)(I), (II). In contrast to the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c), which protects marks that are both famous and distinctive from dilution, a mark needs only one of those qualities to merit protection under the ACPA. *See Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 497 & n. 10 (2d Cir.2000).

### 1. Fame

█ We first consider whether the Plaintiff's mark is famous within the meaning of the statute. Fame under the ACPA is measured by the same "rigorous criteria" set forth in the FTDA. *See Sporty's Farm,* 202 F.3d at 497. The term "famous" is used in its "ordinary English language sense." *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 215 (2d Cir. 1999). One of the factors a court may consider in determining whether a mark is famous is the geographical extent of the trading area in which the mark is used. 15 U.S.C. § 1125(c)(1)(D). A mark is famous if it has achieved a wide degree of recognition by the United States consumer public as the designator of the plaintiff's goods. *TCPIP Holding Co. v. Haar Communications Inc.,* 244 F.3d 88, 98 (2d Cir. 2001). "The geographic fame of the mark must extend throughout a substantial portion of the U[nited] S[tates]." H.R.Rep. No. 374, 104th Cong., 1st Sess.1995, 1996 U.S.C.C.A.N. 1029, 1030–31 (discussing the FTDA); *see also Star Mkts. Ltd. v. Texaco, Inc.,* 950 F.Supp. 1030, 1034–35 (D.Haw.1996) (holding "fame in only one state militates strongly against meriting protection from dilution under federal law"); *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.,* 116 F.Supp.2d 405, 413 (S.D.N.Y.2000). Construing the term "fa-

mous" consistently in both the FTDA and the ACPA, we find that the Plaintiff's mark is not famous because it is not known or recognized as a designator of the Plaintiff's newspapers outside the *Voices* market.

### 2. Distinctiveness

██ We next consider whether the Plaintiff's mark is distinctive. Distinctiveness refers to the "inherent qualities of a mark" and reflects the mark's inherent strength or weakness. A mark may be inherently distinctive or may become distinctive through acquiring secondary meaning to the consuming public. *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1006–07 (2d Cir.1995). In determining whether a trademark is inherently distinctive, we apply the test enunciated by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976), classifying marks as either (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. The Second Circuit has instructed that "[a] generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities, or ingredients in ordinary language and may be protected only if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use 'imagination, thought, and perception to reach a conclusion as to the nature of the goods....'" *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993) (quoting *Stix Prods., Inc. v. United Merchs. & Mfrs. Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). Arbitrary marks are common words which have no logical connection with the product; they neither describe nor suggest its properties, features, or qualities. Fanciful marks are "words invented solely for their use as trademarks." *Abercrombie & Fitch*, 537 F.2d at 11 n. 12.

██ Suggestive and arbitrary or fanciful marks are considered to be inherently distinctive. *Knitwaves*, 71 F.3d at 1007. Descriptive marks may be considered distinctive upon a showing of secondary meaning, while generic marks can never be considered distinctive.

██ Considering these well-known categories, we find that the Plaintiff's mark is at a minimum suggestive as applied to newspapers and perhaps even arbitrary. The word "voices" certainly does not describe in ordinary language the features or qualities of a newspaper. Exercising one's imagination, however, the term could suggest a connection between a newspaper's stories and articles to the voices of the newspaper's contributing writers. On the other hand, any such connection might be so tenuous that the term could be deemed completely arbitrary as applied to newspapers. However, we need not decide whether the mark is suggestive or arbitrary, because the legal consequences would not differ. Nonetheless, because Plaintiff concedes that its mark is suggestive rather than arbitrary, we will consider it as such. Because the mark is inherently distinctive, it is valid, enforceable, and entitled to the protections of the ACPA.

██ Even if we were to consider Plaintiff's mark to be merely descriptive, however, the mark would still merit protection because there is sufficient evidence of secondary meaning. A mark has acquired secondary meaning when "the *primary* significance of the term in the minds of the consuming public is not the product but the producer." *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 815 F.2d 8, 10 (2d Cir.1987) (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 133 (S.D.N.Y.1972)) (emphasis in orig-

inal). The test is whether the "purchasing public associates goods designated by a particular mark with but a single—although anonymous—source." *Centaur Communications Ltd. v. A/S/M/ Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir.1987). Factors that are relevant in determining secondary meaning include: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use." *Id.* at 1222. No single factor is determinative, and every element need not be proved. *Id.*

■ In this case, considering all the factors, we find that the record supports a finding of secondary meaning. Although there is no evidence of advertising expenditures, Plaintiff's product saturates the relevant market, the *Voices* market, because it is received by every household in the *Voices* market three times a week, with a circulation of 28,000 per edition on Mondays and Wednesdays, and 22,500 on Sundays. Plaintiff has received "requester" cards from more than 50% of the households in the *Voices* market, and has more reporters covering news than any other newspaper in the *Voices* market. Most significantly, Plaintiff has used the mark on its product in the relevant market uninterrupted for the past thirty years. We think the Plaintiff's long-standing use of its mark in the relevant market combined with its success in selling advertising and in maintaining its relative popularity within its market outweigh any other factors, including the absence of consumer studies linking *Voices* to one particular source.

Thus, whether we consider the mark to be inherently distinctive and thus valid, enforceable, and entitled to the protections of the ACPA.

**B. Identical or Confusingly Similar**

■ We next consider whether the Defendant's registered domain name "ctvoices.com" is "identical or confusingly similar" to Plaintiff's distinctive mark. 15 U.S.C. § 1125(d)(1)(A)(ii)(I). The Second Circuit has instructed that " 'confusingly similar' is a different standard from the 'likelihood of confusion' standard for trademark infringement adopted by [the Second Circuit] in *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492 (2d Cir.1961)." *Sporty's Farm*, 202 F.3d at 498 n. 11. In *Wella Corp. v. Wella Graphics, Inc.*, 37 F.3d 46 (2d Cir.1994), the Second Circuit explained that when product proximity is not an issue, courts should "simply evaluate whether or not the new mark is confusingly similar to the protected mark, regardless of the products on which the marks are used," rather than analyzing the similarity of the marks using the *Polaroid* factors. *Wella*, 37 F.3d at 48. In this analysis, Defendant's contentions notwithstanding, any similarities or distinctions between the products themselves, *i.e.*, whether or not the content of Defendant's website might compete with Plaintiff's product, are irrelevant.

In considering the domain name at issue, "ctvoices.com," we disregard the top-level domain name (".com"), which merely signifies the site's commercial nature. *Sporty's Farm*, 202 F.3d at 498. We also disregard the capitalization of the first letter in the Plaintiff's mark, since all letters are lower-case in domain names. Thus, the only difference between the Defendant's secondary domain name, "ctvoices," and Plaintiff's mark, "Voices," is the prefix "ct" in the domain name. Defendant has used "ct" as an abbreviation of Connecticut in several of its secondary level domain names, *see supra* Finding of Fact # 43, to appeal to internet users searching for in-

formation on that State. We do not believe the Defendant's addition of a generic or geographic term such as "ct" is sufficient to distinguish the domain name from Plaintiff's protected mark. *See Harrods Ltd. v. Sixty Internet Domain Names,* No. CIV.A. 00–262–A, 2001 WL 739885, at *12 (E.D.Va. Jun.27, 2001). An internet user might reasonably assume that "ct" was added to the Plaintiff's mark by the Plaintiff to identify its geographic location. Thus, we find that the domain name "ctvoices" is confusingly similar to Plaintiff's mark.

## C. Bad Faith Intent to Profit

■ Our next inquiry is whether the Defendant had a "bad faith intent to profit" from the Plaintiff's mark when it registered the domain name. 15 U.S.C. § 1125(d)(1)(A)(i). The statute lists nine non-exclusive factors which the Court may consider in determining bad faith intent.[3] Applying those factors to the factual find-

ings of this case, we find that Plaintiff has carried its burden of showing that Defendant acted with a bad faith intent to profit from Plaintiff's mark.

First, the Defendant had no trademark or other intellectual property rights in "ctvoices" at the time it registered that term as a domain name. The Defendant had never used the word "voices" in connection with any of its newspapers prior to registering the website.

Second, and similarly, the domain name does not consist of the Defendant's legal name or any name used to identify the Defendant or any of its products.

Third, we do not accord significant weight to the Defendant's prior use, if any, of the domain name in connection with the bona fide offering of goods or services, due to the Defendant's admission that it has made little effort to promote the website and does not currently maintain it. *See supra* Findings of Fact # 47.

**3.** These factors are:

1. the trademark or other intellectual property rights of the person, if any, in the domain name;
2. the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
3. the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
4. the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
5. the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
6. the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial

gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
7. the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
8. the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain marks, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
9. the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43.

15 U.S.C. § 1125(d)(1)(B)(i).

■ Fourth, although Defendant maintains that its use of the mark is a fair use and therefore not actionable under the statute, we disagree. Defendant's use of the mark is neither non-commercial nor a fair use as described in 15 U.S.C. § 1115(b)(4). The use does not fall within the statute's exception for fair use because it is neither a nominative use, *see Pebble Beach Co. v. Tour 18 I Ltd.,* 155 F.3d 526, 545 (5th Cir.1998), nor the use of a descriptive term to describe the Defendant's goods or services. *See* 15 U.S.C. § 1115(b)(4). Having already determined that the term "voices" is suggestive rather than descriptive as it pertains to newspapers, we also hold that the term is suggestive rather than descriptive as it pertains to the Defendant's internet bulletin board service. Thus, there is no particular need for the Defendant to use the word "voices" to describe the features or qualities of its bulletin board service.

The fifth factor cuts against the Defendant, since we have already determined that a likelihood exists that business advertisers and internet users, could be confused as to the source, sponsorship, affiliation, or endorsement of the website. *See supra* Findings of Fact # 58. For purposes of this factor, proof of actual confusion is not necessary.

The sixth factor is neutral, since the Defendant has not offered to transfer, sell, or assign the domain name to the Plaintiff or any third party. We do not find this factor significant, though, since a business might benefit equally from warehousing— holding and keeping inactive—a domain name incorporating a competitor's mark, thereby reducing potential advertising or sales revenue, as well as from selling the domain name.

The seventh factor is also neutral, because the Defendant has not provided false contact information or failed to maintain accurate contact information in connection with registering the domain name.

The eighth factor directs our attention to the Defendant's registration of a domain name which it knew was confusingly similar to its competitor's distinctive mark. Although the statutory factor refers to the registration of "multiple" domain names, we find that the registration of a single domain name with the knowledge that it incorporates a competitor's mark similarly informs an inference of bad faith intent.

The ninth factor instructs courts to examine the strength of the mark. We have already determined that the mark is not famous, but is at least suggestive and possibly arbitrary, and therefore inherently distinctive. Because the term is not merely descriptive as it relates to newspapers or to bulletin board services, this factor further supports the inference that the Defendant acted with bad faith intent in registering "ctvoices.com" as a domain name.

Considering the statutory factors and all the facts and circumstances of this case, including the fact that the Defendant registered "ctvoices.com" mere months after summary judgment was entered against it in a copyright action against the Plaintiff, we find that the Defendant acted with bad faith intent to profit from the Plaintiff's protected mark.

## D. Remedies under the ACPA

Having determined that the Defendant violated the ACPA, we must determine what remedies are available to the Plaintiff.

### 1. Injunctive Relief

■ The statute authorizes courts to order the forfeiture, cancellation, or transfer of the domain name to the owner of the mark. 15 U.S.C. § 1125(d)(1)(C); 15

U.S.C. § 1116(a). We believe that a transfer of the domain name is appropriate under the circumstances of this case. Accordingly, we order the Defendant to transfer the domain name "ctvoices.com" to the Plaintiff within thirty days of the date of this ruling. In addition, the Court enjoins the Defendant's use of the word "voices," whether standing alone or in combination with any generic or geographic terms, in connection with a website, domain name, metatag, search term, or search engine.

### 2. Damages

■ Damages, whether actual or statutory, are not available under the ACPA with respect to the registration, trafficking, or use of a domain name that occurred before the date of the Act's enactment, Nov. 29, 1999. *See* Pub.L. No. 106–113, § 1030. *See also Sporty's Farm*, 202 F.3d at 499 n. 14. Because the Defendant registered the domain name "ctvoices.com" in July, 1999, this Court lacks authority to award damages.

## II *FEDERAL DILUTION CLAIM*

■ Plaintiff also makes a claim under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c).[4] In order to prevail on a claim of dilution under the FTDA, a plaintiff must prove that the senior mark is famous *and* distinctive, the junior use is a commercial use in commerce which began after the senior mark became famous, and that the junior use has caused dilution of the distinctive quality of the senior mark. *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir. 1999). As discussed above in the context of Plaintiff's cybersquatting claim, the mark "Voices" is not famous as a designator of the Plaintiff's product outside the *Voices* market. Therefore, the mark is not entitled to the protections of the FTDA.

## III *FALSE DESIGNATION OF ORIGIN CLAIM*

■ Plaintiff also claims that the Defendant's use of the term "voices" in "ctvoices.com" violates section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1), which protects trademark owners from false designations of origin. Although we think Plaintiff's claim is a much better fit with the provisions of the ACPA than with section 43(a), *see Sporty's Farm*, 202 F.3d at 496–97, the two provisions are not mutually exclusive. Howev-

---

**4.** The statute provides, in relevant part:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to—

(A) the degree of inherent or acquired distinctiveness of tie mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

er, the Plaintiff can gain no greater relief under section 43(a) than the injunctive relief we previously granted under the ACPA, because damages under those both those provisions are unavailable for claims involving the registration, trafficking, or use of a domain name that occurs before Nov. 29, 1999. *See* Pub.L. 106–113 sec. 3010, 113 Stat. 1501, at 1501A–552 (Nov. 29, 1999) (specifying effective date of ACPA and noting exception to damages under 15 U.S.C. § 1117(a), (d)). Nonetheless, like the cautious fellow who sports both belt and suspenders, we shall proceed to examine Plaintiff's claim under section 43(a).

Analysis under this section requires that a court apply the factors set forth in *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir.1961) to the relevant facts in order to determine whether the use of a mark is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...." 15 U.S .C. § 1125(a)(1)(A). According to Judge Friendly,

> [w]here the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Polaroid*, 287 F.2d at 495.

For purposes of this analysis, we consider the Plaintiff's newspaper and the Defendant's website to be different products. We have already determined that the Plaintiff's mark is inherently distinctive by virtue of being suggestive. Therefore, the mark is fairly strong, although not as strong as a fanciful mark. We have also determined that the protected mark "voices" is similar, indeed, confusingly similar, to "ctvoices."

Proximity of the products refers to the similarity of the products the marks identify. Although a website is a natural extension of a newspaper's goal of communicating with its customers, Defendant's website currently contains no news stories. Nonetheless, we think a consumer in the *Voices* market searching for a website associated with *Voices* could be confused as to the origins of "ctvoices.com." Moreover, Plaintiff has demonstrated that it intends to "bridge the gap" by seeking to register its own domain name and create an online news service.

As for the remaining factors, there is no evidence of actual confusion. However, there is sufficient evidence to support an inference that the Defendant was not acting in good faith when it registered "ctvoices.com." In addition, the Defendant concedes that its website is not successful as a bulletin board service. Its poor quality could negatively impact the goodwill Plaintiff has developed in its mark in the *Voices* market. Finally, there has been no evidence that either buyers of *Voices* or users of "ctvoices.com" are sufficiently sophisticated to counter potential confusion as to the source of the website.

Considering all the factors in light of the relevant evidence in this case, we find that Defendant's use of the term "voices" in its domain name is likely to cause confusion as to the origin, sponsorship, or approval of its website in the *Voices* market, in violation of section 43(a). Plaintiff is therefore entitled to injunctive relief, as specified in our discussion of Plaintiff's ACPA claim, but not to money damages,

as discussed earlier in this section. Furthermore, even if the statutory damages provision did apply, we would decline to award costs or attorney fees due to the unexceptional nature of this case.

### IV CUTPA CLAIM

Plaintiff further claims that the Defendant's conduct violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. §§ 42–110a to 42–110q. CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn.Gen.Stat. § 42–110b(a). CUTPA applies only if the practice: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen. *See Saturn Const. Co. v. Premier Roofing Co.,* 238 Conn. 293, 310–11, 680 A.2d 1274 (1996) (applying the so-called "cigarette rule" to determine whether certain conduct is an unfair or deceptive trade practice). All three criteria need not be satisfied in order to find a violation of CUTPA. Rather, a court may find a CUTPA violation based on "the degree to which [a practice] meets one of the criteria or because to a lesser extent it meets all three." *Id.*

A finding of bad faith intent to profit in violation of the ACPA, however, does not constitute a *per se* violation of CUTPA. *See Sporty's Farm,* 202 F.3d at 501. Thus, even though "an ACPA violation meets the requirements of prong one of the cigarette rule test," *id.,* we do not believe the Defendant's conduct could be deemed immoral, unethical, oppressive, or unscrupulous. Moreover, there is no evidence of a substantial injury to consumers or to the Plaintiff. Balancing all three criteria, we find no CUTPA violation.

### V CONNECTICUT COMMON LAW UNFAIR COMPETITION CLAIM

Finally, Plaintiff claims that Defendant's conduct violated Connecticut's common law prohibiting unfair competition. The common law action of unfair competition is a general tort covering many activities that may be harmful to commercial interests. *See Connecticut State Medical Society v. Board of Examiners in Podiatry,* 203 Conn. 295, 524 A.2d 636 (1987). One such impermissible activity is the "appropriation by one corporation of a distinctive portion of the name of another [which] cause[s] confusion and uncertainty in the latter's business, injure[s] them pecuniarily and otherwise, and deceive[s] and mislead[s] the public...." *Mohegan Tribe of Indians v. Mohegan Tribe & Nation, Inc.,* 255 Conn. 358, 769 A.2d 34, 47 (2001) (quoting *Shop–Rite Durable Supermarket, Inc. v. Mott's Shop Rite,* 173 Conn. 261, 377 A.2d 312 (1977)). While we have already determined that there is some likelihood of confusion in the *Voices* market as to the source of the Defendant's website, Plaintiff has failed to show any actual confusion or any pecuniary injury. Thus, even if we were to find that Defendant's conduct rose to the level of unfair competition—which we do not—we would afford Plaintiff no further relief other than the injunction previously granted for the ACPA violation.

### CONCLUSION

For the foregoing reasons, we find in favor of the Plaintiff on its ACPA claim and order the Defendant to transfer the domain name "ctvoices.com" to the Plaintiff within thirty days from the date of this ruling. In addition, the Court enjoins the Defendant's use of the word "voices," whether standing alone or in combination with any generic or geographic terms, in

connection of any website, domain name, metatag, search term, or search engine.

Pursuant to 15 U.S.C. § 1116(a), we direct the Defendant to file with the Court and serve on the Plaintiff within thirty days after the date of this ruling a report in writing under oath setting forth in detail the manner and form in which the Defendant has complied with the terms of this injunction.

**SO ORDERED.**